**EPLUS, INC., Plaintiff,**

v.

**LAWSON SOFTWARE, INC., Defendant.**

**Civil No. 3:09cv620.**

United States District Court, E.D. Virginia, Richmond Division.

Jan. 26, 2011.

Case no. 00–C–2393, 2003 WL 21209832 at *6 (N.D.Ill. May 21, 2003).

Andrew Neal Stein, Goodwin Procter LLP, New York, NY, Craig Thomas Merritt, Belinda Duke Jones, Henry Irving Willett, III, Rowland Braxton Hill, IV, Christian & Barton LLP, Richmond, VA, David Michael Young, Jennifer Ann Albert, Scott Lynn Robertson, Eleanor Martha Hynes, Goodwin Procter LLP, Washington, DC, James David Clements, Lana Svetlana Shiferman, Daniel Mark Forman, Michael Gavin Strapp, Srikanth Kadumpalli Reddy, Goodwin Procter LLP, Boston, MA, for Plaintiff.

Andrew John Lagatta, Daniel William McDonald, Rachel Clark Hughey, William Daniel Schultz, Eric Ronald Chad, Joshua Paul Graham, Merchant & Gould PC, Minneapolis, MN, Robert William Busby, Jr., Bradford Anthony Cangro, Morgan Lewis & Bockius LLP, Washington, DC, Daniel Johnson, Jr., Morgan, Lewis & Bockius LLP, Palo Alto, CA, Rita Emily Tautkus, Morgan Lewis & Bockius LLP, San Francisco, CA, Dabney Jefferson Carr, IV, Megan Conway Rahman, Robert Armistead Angle, Troutman Sanders LLP, Stephen Dennis Otero, Richmond, VA, Kirstin Leigh Stoll–Debell, Merchant & Gould PC, Denver, CO, for Defendant.

## MEMORANDUM OPINION

ROBERT E. PAYNE, Senior District Judge.

This matter is before the Court on DEFENDANT LAWSON SOFTWARE, INC.'S MOTION *IN LIMINE* NO. 3 TO PRECLUDE DR. RUSSELL W. MANGUM III FROM TESTIFYING AT TRIAL (Docket No. 257). For the reasons set forth on the record on August 10, 2010,[1] as

---

1. At that time, the trial of the case was set for    September 13, 2010, and, therefore, the Court

further explicated by this Memorandum Opinion, the motion was granted and Dr. Mangum was precluded from testifying at trial.

## BACKGROUND

This action filed by ePlus, Inc. ("ePlus") against Lawson Software, Inc. ("Lawson") seeks damages for patent infringement and an injunction against further infringement. To prove damages, ePlus proffered the testimony of Dr. Russell W. Mangum III in support of a claim for reasonable royalties. Following the filing of all expert reports and the deposing of the experts, Lawson filed this motion seeking to preclude Dr. Mangum from testifying at trial.

The text of the motion seeks preclusion only on the theory that Dr. Mangum's opinion is based on irrelevant settlement agreements. The supporting memorandum seeks preclusion for the additional reason that Dr. Mangum's opinion "is based on assumptions and guesswork rather than the reliable, scientific analysis required by the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." In reply to the opposition filed by ePlus and the positions asserted therein, Lawson also challenged the report and testimony of Dr. Mangum on the related ground that he "relies on an over-inclusive royalty base and his proposed royalty rate is unsupported even by the irrelevant license agreements he relies on." After briefing was concluded and oral argument heard, the Court indicated that it was inclined to grant the motion. At ePlus' request, the Court heard additional argument on August 10, 2010 at which time the motion was granted. An Order to that effect (Docket No. 410) was entered on August 11, 2010.

thought it appropriate to inform the parties of the decision so they could better prepare for the Final Pretrial Conference which was set

Dr. Mangum's proffered damages testimony was addressed to the appropriate reasonable royalty rate for Lawson's alleged infringement on the three patents-in-suit. Dr. Mangum's methodology for arriving at an appropriate royalty rate began with the establishment of a baseline royalty rate. Thereafter, Dr. Mangum opined that a reasonable royalty rate for each of the three patents-in-suit would be "in the range of 5% to 6% of net revenues" derived from Lawson's sale of the accused products and of services related thereto. Dr. Mangum concluded that Lawson's sale of accused products and the related services from November 1, 2003 to September 30, 2010 were estimated to be $401,358,040. He then applied a 5% royalty rate to those sales and calculated that, at that rate, the total royalties would be approximately $20,670,902 (increasing to $24,764,685 with prejudgment interest). At the 6% royalty rate, the calculated reasonable royalties were thought by Dr. Mangum to be approximately $24,081,482 (increasing to $29,717,623 with prejudgment interest).

Dr. Mangum's analysis purported to follow the structure established by *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y.1970) and, indeed, the report was outlined with those factors as topic headings. The report began with *Georgia–Pacific* Factor 15 which is the hypothetical negotiation. In essence, Factor 15 requires arriving at royalty that a licensor and a licensee would have agreed upon at the time infringement began if both had been reasonably and voluntarily trying to reach a settlement. In sum, a royalty, to be reasonable, should approximate that which hypothetically could have been agreed upon under that scenario. In this case, according to Dr. Mangum, the

for August 16, 2010. This memorandum supplements the oral decision given on August 10, 2010.

negotiation would have occurred in the weeks or months before the first infringement, "concluding just prior to May 2002."

Dr. Mangum used *Georgia–Pacific* Factor 1 as the basis for determining the baseline royalty rate that would have been produced as the result of the hypothetical negotiation. *Georgia–Pacific* Factor 1 is: the royalties received by the patentee for the licensing of the patent-in-suit as proving or intending to prove an established royalty.[2] Dr. Mangum identified five instances in which the patents-in-suit, collectively, were licensed. Each of those licenses were made pursuant to settlement agreements that ensued the commencement, or conclusion, of patent infringement suits filed by ePlus.

Three of those settlements, the Verian settlement, the SciQuest settlement and the Perfect Commerce settlement, occurred very shortly after the patent litigation began. Verian paid ePlus $500,000 plus a 2.5% running royalty on all sales covered by the patents-in-suit in excess of $15 million within a calendar year. SciQuest agreed to pay ePlus $2.4 million, and Perfect Commerce agreed to pay a lump sum payment of $750,000. Dr. Mangum did not include these licenses in analyzing Factor 1 to find the royalty rate that would have come from the hypothetical negotiation. That, according to Dr. Mangum, was because those cases were all settled very shortly after the commencement of litigation and before any discovery had occurred which, according to Dr. Mangum, precluded ePlus from obtaining "information that would allow it to form an understanding as to the amount of accused revenue for any of these three parties." Dr. Mangum then opined that:

> [a]s a result, the terms of the agreements [with Verian, SciQuest and Per-

fect Commerce] do not represent a complete valuation of the specific use of the patents-in-suit, but rather were based on the avoidance of litigation. In addition, the terms in the Verian, SciQuest and Perfect Commerce agreements do not provide sufficient information for determining the royalty that would result from an arm's length (hypothetical) negotiations between a willing licensor and a willing licensee.

At most, according to Dr. Mangum, those agreements provided evidence of willingness by ePlus and others to enter into fixed payment and running royalty license agreements relating to the patents-in-suit.

Thus, the core of Dr. Mangum's analysis became the settlement agreements reached in two litigated cases, the so-called Ariba and SAP agreements. The Ariba agreement was reached after a jury returned a verdict of infringement. Ariba agreed to pay $37 million in three different installments for a paid up license for all three ePlus patents. Ariba also agreed to cross-license ePlus on all Ariba patents. The SAP agreement occurred after a hung jury mistrial was declared. SAP agreed to a one time payment of $17.5 million. In return, ePlus granted SAP rights to all of its U.S. and foreign patents, and SAP agreed to not to pursue ePlus for infringement of any SAP patent as of the date of the agreement or any patent acquired within five years after the date of the agreement.

Dr. Mangum then converted these lump sum payments by Ariba into a running royalty rate by using an expert report from the SAP litigation that was based on Ariba's sales, past and projected. The record shows that Dr. Mangum simply adopted the figures from the expert in

**2.** This opinion uses the articulation of the *Georgia–Pacific* factors given by Dr. Mangum in his report, rather than citing directly to the

*Georgia–Pacific* decision. Neither party contends that Dr. Mangum misstated the factors.

SAP as part of his opinion. Thereafter, Dr. Mangum used the expert report from the SAP litigation as to Ariba's 2003 sales figure as an assumed basis for projecting future Ariba sales income, annually from 2005 through 2017, without explaining why it was appropriate to do so. He then applied compounding and discount factors, and established a present value cash flow. Then, Dr. Mangum converted the result into four different effective running royalty rates based on four different assumptions respecting the remaining effective life of the technology. Depending on the life of the technology, those running royalty rates ranged from a low of 3.0% to a high of 8.3%. Dr. Mangura then set aside the extremes (3.0% and 8.3%) leaving a range of 3.3% to 4.2%, with a mid point of 3.8%.

He followed the same methodology as to the SAP agreement and concluded that the effective running royalty rates that could be converted from the lump sum payment required by the SAP agreement would range from a low of 1.8% to a high of 3.2%. Again setting aside the extremes (1.8% and 3.2%), Dr. Mangum concluded that the range of running royalty rates would be 2.0% to 2.4%, with a mid point of 2.2%.

Because Dr. Mangum concluded that the Ariba settlement involved a contribution of its intellectual property rights and occurred in circumstances in which Ariba was paying the maximum it could afford to pay without declaring bankruptcy, Dr. Mangum concluded that the running royalty rates he had calculated for the Ariba lump sum payments understated, in an unarticulated quantum, the amounts that would be reached in a hypothetical negotiation between ePlus and Lawson. Dr. Mangum also explained that the SAP agreement involved situations different from the hypothetical agreement to a larger extent than did the Ariba agreement. First, he considered that SAP, contrary to

Ariba, had not been found liable of infringement, there having been a hung jury in the case. That, in turn, meant to him that SAP's claims of patent noninfringement and invalidity were unadjudicated, unlike in Ariba where the jury had returned a verdict in favor of ePlus. Dr. Mangum also noted that SAP had filed for re-examination of one of the patents-in-suit. Finally, he concluded that, because of those (and other differences which the Court finds difficult to understand), the amount that SAP had paid to ePlus for the agreement was not as "closely tied to the patents-in-suit as the Ariba agreement, and should be given less weight." However, Dr. Mangum did not express the quantum of that lesser weight. He did find that, the running royalty rates that he had calculated "likely underestimate the net value attributable just to the patents-in-suit" because SAP had given expensive patent rights to ePlus as part of the settlement.

Dr. Mangum then turned to a discussion of the other *Georgia–Pacific* factors as the basis for increasing the royalty rate produced by the hypothetical negotiation from a range of 2.2% to 3.8% to 5% to 6%.

Dr. Mangum discounted *Georgia–Pacific* Factor No. 2 (the rates paid by the licensee for the use of other patents comparable to the patents-in-suit) because there were none. He then concluded that *Georgia–Pacific* Factor Nos. 3, 4, 7 and 14 were neutral in the calculation of royalty rates. In other words, those factors neither increased nor decreased the rate that came out of the hypothetical negotiation.

Dr. Mangum next purported to articulate the effects of *Georgia–Pacific* Factor Nos. 5, 6 and 8 through 13. For each of those factors, Dr. Mangum's analysis concluded with phrases such as "evaluation of this factor [5] indicates a *higher* royalty

rate."[3] In no instance, did Dr. Mangum's evaluation purport to indicate the extent to which those factors (*Georgia–Pacific* Factor Nos. 5, 6 and 8 through 13) would increase the royalty rate that he had arrived at by converting the Ariba and SAP lump sum payments into a running royalty which he used as the baseline royalty rate for his opinion. Instead, Dr. Mangum opined only "that the reasonable royalty applicable to Lawson's use of the patented technology falls in the range of 5% to 6%." In so doing, he expressed the view that *Georgia–Pacific* Factor Nos. 5, 6 and 8 through 13 somehow operated to increase the royalty calculation range from 2.2% to 3.8% to a range of 5% to 6%, thereby, in effect, virtually doubling the royalty rate.

## DISCUSSION

■ Federal Rule of Evidence 702 permits the testimony of experts on a variety of subjects, including damage evidence if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is a product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." These conditions are the codification of concepts announced in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert* established clearly that a trial judge has the obligation to ensure that expert evidence is relevant and reliable before it is tendered to a jury. The relevance requirement is grounded in that part of FRE 702 which requires that expert evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue." In *Daubert*, the Court also explained that " 'an additional consideration under Rule 702—and another aspect of

relevancy—is whether expert testimony proffered in the case is *sufficiently tied to the facts of the case* that it will *aid the jury* in resolving a factual dispute.' " *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985)) (emphasis added). That consideration commonly is referred to as "fit." *Id.*

*Daubert* also established the need for expert testimony to be reliable, outlining several steps to aid in that inquiry where the testimony was scientific in nature. The reliability-component is grounded in that part of FRE 702 requiring an expert's testimony to pertain to scientific, technical or specialized knowledge.

■ The Court made clear that, in exercising the gatekeeping responsibility, a trial court must focus on the principles and methodology used by the expert, not on the validity of the expert's conclusions. *Id.* at 595, 113 S.Ct. 2786. And, it is also essential that, in exercising the gatekeeping duty, the trial court must remain mindful of other applicable rules of evidence including, FRE 403. In sum, keeping in mind all of the rules of evidence, it is the trial judge's responsibility to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597, 113 S.Ct. 2786.

Six years after deciding *Daubert*, the Supreme Court once again confronted the issue of the gatekeeping function in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In *Kumho*, the Court determined that the basic principles of *Daubert* apply to all expert testimony whether it is scientific in nature, technical in nature or based on

---

**3.** Likewise, Dr. Mangum determined that evaluation of Factor 6 and Factor 8, analyzed separately, "indicates a higher royalty rate," while evaluation of Factors 9, 10, and 11, discussed together, "suggests a *higher* royalty rate." Finally, Dr. Mangum concluded that evaluation of Factors 12 and 13, discussed together, "suggests a *higher* royalty rate, other things being equal."

other specialized knowledge. *Kumho,* 526 U.S. at 148, 119 S.Ct. 1167.

Further, in *Kumho,* the Court, quoting its decision in *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), reiterated that " 'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.' " *Id.* at 157, 118 S.Ct. 512. *Ipse dixit* is defined to mean: "he himself said it" or "she herself said it" or "something asserted but not proved" *Black's Law,* New Pocket Edition, 1996; "he himself said it" or "an assertion without proof;" *Dictionary.com;* and "an unproven assertion resting on the bare authority of some speaker;" or a "dogmatic statement," *Oxford English Dictionary.*

The reason which underpins the well-known prohibition against *ipse dixit* testimony by experts is, of course, that "conclusions and methodology are not entirely distinct from one another." *Joiner,* 522 U.S. at 146, 118 S.Ct. 512. As the Court, in *Joiner,* made clear, the prohibition against allowing *ipse dixit* testimony by experts merely clarifies that the district court's broad discretion includes the discretion to find that there is " 'simply too great an analytical gap between the data and the opinion proffered.' " *Pugh v. Louisville Ladder, Inc.,* 361 Fed.Appx. 448, 454 n. 4 (4th Cir.2010) (quoting *Joiner,* 522 U.S. at 146, 118 S.Ct. 512); *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 202 (4th Cir.2001); *Westfield Ins. Co. v. Harris,* 134 F.3d 608, 613 (4th Cir.1998); *Phelan v. Synthes (U.S.A.),* 35 Fed.Appx. 102, 107 (4th Cir.2002).[4]

■ The framework for analysis of Lawson's motion, therefore, is provided by FRE 702 and the decisions of the Supreme Court in *Daubert, Joiner,* and *Kumho.*

Application of those principles to the facts of this case require that Dr. Mangum's testimony be excluded.

■ First, Dr. Mangum's reasonable royalty calculation is predicated upon license agreements that are contained in settlement agreements that ensued litigation. At one time, it was the rule that settlement agreements simply could not be considered at all in the reasonable royalty calculus. *Rude v. Westcott,* 130 U.S. 152, 164, 9 S.Ct. 463, 32 L.Ed. 888 (1889) ("It is clear that a payment of any sum in settlement of a claim for an alleged infringement cannot be taken as a standard to measure the value of the improvements patented, in determining the damages sustained by the owners of the patent in other cases of infringement."). It is now, however, well-settled that settlement agreements entered into in the context of litigation may be considered, but that they have minimal probative value respecting the calculation of reasonable royalties. *See e.g. ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 872 (Fed.Cir.2010).

The minimal probative value that can be attributable to settlement agreements that ensue litigation is even less where, as here, the settlement agreements occurred years after the hypothetical negotiation called for by *Georgia–Pacific* analysis would have occurred. Moreover, in this case, the two settlement agreements used by Dr. Mangum call for lump sum payments and they include extensive cross-licensing agreements respecting numerous patents. Thus, they differ considerably from the factual predicates present here where the hypothetical negotiation does not involve a lump sum payment or cross-licensing of a wide variety of patents. The disparity of circumstances between the settlement agreement lump sum licenses and the

---

4. The prohibition does not shift the focus of the *Daubert* test to expert's conclusions. *Id.*

hypothetical negotiation for a running royalty and the temporal differences make it difficult to find that the "fit" component is met. And, that further diminishes the relevance of using the Ariba and SAP settlements as the linchpin for the baseline royalty.

■ It also is settled that lump sum settlement agreements have minimal, if any, probative value in establishing a reasonable running royalty. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329–30 (Fed.Cir.2009); *see Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319–20 (Fed.Cir.2010). Even when a lump sum royalty agreement can be extrapolated to suggest a reasonable running royalty, the methodology must itself be sound and not speculative and not far removed from the facts of the case as it is here.

Second, Dr. Mangum's royalty base is calculated by using sales figures extracted from an expert report filed in previous litigation, in particular, the SAP and Ariba litigations. Those figures are then used to extrapolate the base for a running royalty rate calculated using the lump sum payments in Ariba and SAP. Thus, it is difficult to perceive a "fit" between a hypothetically negotiated reasonable royalty rate in the context of this case and the assumptions used by Dr. Mangum to arrive at the royalty base on which he produced the royalty rates which he sponsors.

Further, Dr. Mangum does not explain why it was sound to project that the Ariba and SAP sales figures will continue for more than a decade into the future. That is particularly problematic where, as here, the early years of the projection period fall in a period of economic decline unprecedented since the Great Depression. Use of projections is a relatively sound economic method, but ePlus has cited no authority which permits use of that method by an expert who does not explain why use of the method is sound in perspective of the economic realities which appear during the projection period. The Court could find no such authority.

Third, Dr. Mangum's royalty calculations utterly ignore three litigation settlements that significantly would reduce the royalty rate under the methodology that he used. The reason given for disregarding these settlement terms, all of which involved lump sum payments and one of which also contained a contingent running royalty of 2.5%, is that the settlements were based "on avoidance of litigation." Of course, that ignores that the SAP settlement was agreed to after a jury could not reach a verdict and the Ariba settlement occurred while the case was on appeal. Thus, in both situations, avoidance of further litigation would certainly appear to be a motivating factor in arriving at the settlement agreements that Dr. Mangum chose to use to determine the predicate for his calculations. It also ignores the fact that many, if not most, settlements are animated, in large part, by a desire to avoid the expense of litigation. The frailty of that reasoning suggests strongly that it was the small amount of the settlements, rather than the avoidance of litigation that kept Dr. Mangum from including the Verian, SciQuest and Perfect Commerce settlements in his calculus. More importantly, Dr. Mangum's given reason for excising those three settlements from his royalty calculations was not explained to be a valid principle of economic analytical method.[5]

Fourth, Dr. Mangum's calculations run contrary to the command of the Supreme Court in *Joiner* (when applying *Daubert*), as well as to the reiteration of the *Joiner*

---

5. Dr. Mangum also ignored, without explanation, the fact that, after ePlus acquired the patents-in-suit, it valued the patent rights at $12,000, combined.

principle in *Kumho*, that "nothing in either *Daubert* or the Federal Rules of Evidence requires the district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146, 118 S.Ct. 512. In particular, in this case Dr. Mangum used the dubious royalty base and the marginally useful litigation settlements to arrive at the conclusion that the hypothetical negotiation would produce a baseline royalty rate in the range of 2.5% to 3.7%. Then, he opined that *Georgia–Pacific* Factor Nos. 5, 6 and 8 through 13 would suggest some unarticulated quantum of "higher" royalty rate. He articulated as well that he had considered each of the factors in the cumulative relative rate and then stated that the reasonable royalty rate which the hypothetical negotiation would produce here would be in the range of 5% to 6% without explaining at all how it was that the application of any one or all of those factors would permit an increase in the base royalty rate of approximately 100%. That is the quintessential *ipse dixit*. It is so because I, the expert, say it is so. I need not offer an explanation for why it is so. It is precisely that kind of opinion that *Daubert*, *Kumho*, and *Joiner* require the district courts to exclude.

Finally, all of the foregoing flaws, the questionable royalty base, the use of questionable, minimally probative settlement agreements to arrive at a royalty rate, and the conversion of lump sum royalty rates to running royalty rates using a speculative royalty base, together with the *ipse dixit* nature of the ultimate opinion which doubles the royalty rate arrived at in the hypothetical negotiation, quite simply fails the "fit" requirement for the facts of this case.

Taken as a whole, Dr. Mangum's opinions are speculative and not based in sound economic precepts that are explained so that a jury could understand why it is reasonable to award such a royalty rate as that called for in Dr. Mangum's conclusions. That kind of testimony does not assist a jury to determine a disputed issue or to understand other evidence. Indeed, it merely confuses the finder of the fact and asks the jury to accept the expert's view merely because it was expressed by an expert.

■ For all of those reasons, Dr. Mangum's testimony is neither relevant nor reliable. And, indeed, because of its defects, singular and collective, his testimony is likely to confuse a jury and, its prejudicial consequences substantially outweigh its probative value.

ePlus argues that the decision of the Federal Circuit in *i4i Ltd. Partnership v. Microsoft*, 598 F.3d 831 (Fed.Cir.2010), compels a different result. In *i4i*, the expert arrived at a royalty rate of $96 per unit which he thought would be produced by the hypothetical negotiation. Then, after a generalized assessment of *Georgia–Pacific* Factors 3, 5, 6, and 9, he increased the rate by $2, to $98 per unit. The expert opined that Factor 3 would have lowered the base rate, while Factors 5, 6 and 9 would have raised the base rate.

ePlus points out that, in *i4i*, the Federal Circuit held that the royalty rate evidence was sufficient under *Daubert*. However, in *i4i*, the Federal Circuit did not have before it an expert opinion that increased the baseline royalty range by 100%. Rather, the baseline was increased by only $2, an increase of 2.0833% ($2 is 2.0833% of $96). Moreover, the decision in *i4i* does not reflect that the $2 increase was the subject of the defendant's appeal. Rather, the opinion reflects that the defendant's argument, and the ensuing decision, was focused on how the baseline was calculated, not on the increase. And, the Federal Circuit held that the defendant's com-

plaints were directed to the expert's conclusions rather than to his methodology.

Here, the attack on the doubling of the baseline is predicated on the expert's methodology. And, nothing in *i4i* can be construed to approve the *ipse dixit* method used by Dr. Mangum to double the baseline royalty. ePlus argues that exact, to-the-penny, quantification is not required, and that is no doubt correct. But, here, Dr. Mangum has increased the royalty pre-interest damages from approximately $10 million to $20 million, merely on his say so. ePlus has cited no authority which approves use of generalized application of the *Georgia–Pacific* factors to double the baseline royalty rate, either with or without articulation of the extent to which each factor supported such an increase. Nor could the Court locate any such authority.

Indeed, to allow the opinion of Dr. Mangum into evidence is to sanction a return to the practice that allowed experts to give *ipse dixit* opinion testimony which widely prevailed before the Supreme Court decided *Daubert, Joiner* and *Kumho* and before FRE 702 was amended. The Court declines the invitation to do that. To do so would be to abdicate the gatekeeping duty imposed by *Daubert* and its progeny.

## CONCLUSION

For the foregoing reasons and those stated on the record on August 10, 2010, DEFENDANT LAWSON SOFTWARE, INC.'S MOTION *IN LIMINE* NO. 3 TO PRECLUDE DR. RUSSELL W. MANGUM III FROM TESTIFYING AT TRIAL (Docket No. 257) was granted.

An Order already has issued (Docket No. 410) on August 11, 2010.

It is SO ORDERED.